UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

CHELENA J. MCCOY,

       Plaintiff,

v.                                    Civil Action No. 2:23-cv-00314

KANAWHA COUNTY BOARD OF EDUCATION
and DR. THOMAS F. WILLIAMS, JR.,
Superintendent, Kanawha County
Schools,

       Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

       Pending before the court is defendants' Motion to Dismiss Complaint.  ECF Nos. 5, 6 ("Def. Mem.").  Plaintiff filed a response in opposition, ECF No. 9 ("Pl. Resp."), to which defendants replied, ECF No. 10 ("Def Reply").  The motion is fully briefed.

I.  Background

       The following allegations are drawn from the plaintiff's complaint and are regarded as true for the purposes of the motion to dismiss.

       Plaintiff Chelena McCoy ("McCoy" or "plaintiff") is a Licensed Professional Counsellor ("LPC") and a School Counselor for Belle Elementary School in Belle, West Virginia, where she

has worked for the previous 11 years.  Compl. ¶¶ 1, 14, 19, 20,
ECF No. 1.  Defendant Kanawha County Board of Education
("Board") controls and manages operations of Kanawha County
Schools ("KCS").  Id. ¶ 15.  Defendant Dr. Thomas F. Williams,
Jr. ("Williams") is the Superintendent appointed by the Board to
administer and oversee the day-to-day operations of KCS.  Id.
¶ 16.

    From 2013 to 2021, McCoy helped administer the West
Virginia General Summative Assessment (the "WVGSA") each spring
at Belle Elementary as the School Test Coordinator.  See id.
¶ 23.  The WVGSA is the State of West Virginia's version of a
federally mandated assessment test.  See id. ¶¶ 1, 24.  In
administering the WVGSA, the United States Department of
Education ("USDOE") "expects schools to achieve a 95%
participation rate."  Id. ¶ 1; see id. ¶¶ 3, 23.  McCoy avers
that "Belle always achieved or exceeded the expected 95%
participation rate for the WVGSA," except during the COVID-19
pandemic when USDOE waived the 95-percent participation
requirement.  Id. ¶ 23; see id. ¶¶ 3, 30.

    Like countless other schools, the COVID-19 pandemic
disrupted instruction and annualized testing at Belle
Elementary.  The WVGSA for the 2019-2020 school year was
canceled across West Virginia.  Id. ¶ 24.  During the 2020-21

school year, "approximately 30" Belle Elementary students "[e]xercis[ed] a safety option"[1] and attended classes remotely from home due to concerns about COVID-19 (hereinafter, the "Online Learners").  Compl. ¶ 2.

In February 2021, as the 2021 WVGSA approached, the West Virginia State Department of Education ("WVDOE") addressed a letter to parents and guardians of students in Grades 3 through 8 regarding the forthcoming WVGSA (the "WVDOE Letter"). See id. ¶ 31; id. at Ex. 2, 1.  Plaintiff attached a copy of the WVDOE Letter to the complaint.[2]  See Compl. Ex. 2.  As pertinent to this matter, the WVDOE Letter stated:

> Although counties and schools continue to deal with challenges, it is even more critical this year that we obtain data on each of our students to further measure how much impact the pandemic has had on student learning. The WVGSA results will help to identify any achievement gaps that may have occurred so teachers can determine how best to bridge those gaps.

---

[1] It is unclear from the complaint whether this option was provided only by Belle Elementary or pursuant to a policy of the Board.

[2] The court considers — and accepts as true for purposes of this motion — "documents that are explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits."  Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016)

> The WVGSA, which measures academic progress for students and schools in West Virginia, is an untimed test administered online.
>
> * * *
>
> The test will be administered at your student's school or at an off-site location to be determined by the county.
>
> * * *
>
> Your student's school will provide you with more information about this year's administration, including when the assessment will be administered. If you have questions or concerns, please contact the principal or counselor at your student's school, or the district test coordinator at your county's board of education office.

WVDOE Letter, ECF No. 1-2.  A list of Frequently Asked Questions (the "WVGSA FAQ") accompanied the letter and included the following questions:

> "Q. Can students take the test remotely?
>
> A. No, remote testing is not allowed. All tests are administered in an in-person setting.
>
> Q. Can students opt out of taking the state's summative assessment in spring 2021?
>
> A. Neither West Virginia law nor the regulations of the West Virginia Board of Education contain provisions for 'opting out' of statewide assessments, and we are aware of no legal right for parents or students to do so."

Id. ¶¶ 34-35; WVGSA FAQ, Compl. Ex. 2, ECF No. 1-2, at 2.

The WVDOE Letter and WVGSA FAQ were distributed to all parents and guardians whose children attended Kanawha County Schools in accordance with instructions from the Board.  See Compl. ¶¶ 33, 38.

Later that same month, on February 22, 2021, USDOE issued a guidance document about the upcoming summative assessments in each state (the "USDOE Guidance"), which was directed to each "Chief State School Officer."[3]  Id. ¶ 25; see Compl. Ex. 1, ECF No. 1-1 (USDOE Guidance).  The USDOE Guidance acknowledged the important role of summative assessments like the WVSGA:

> To be successful once schools have re-opened, we need to understand the impact COVID-19 has had on learning and identify what resources and supports students need. We must also specifically be prepared to address the educational inequities that have been exacerbated by the pandemic, including by using student learning data to enable states, school districts, and schools to target resources and supports to the students with the greatest needs. In addition, parents need information on how their children are doing. State assessment and accountability systems play an important role in advancing educational equity.
>
> * * *

---

[3] As related to West Virginia, this letter appears to be directed at the State Superintendent of Schools, who supervises the state's public schools and leads the state Board of Education. See W. Va. Code § 18-3-1, et seq.

> [It] is clear that the pandemic requires
> significant flexibility for the 2020-2021
> school year so that states can respond to the
> unique circumstances they are facing; keep
> students, staff, and their families safe; and
> maintain their immediate focus on supporting
> students' social, emotional, and academic
> development.

USDOE Guidance, at 1, ECF No. 1-1; Compl. ¶ 26.  The USDOE

Guidance encouraged "flexibility" as it concerned "assessment,

accountability, and reporting systems for the 2020-2021 school

year."  Id.  In a paragraph labelled, "Assessments," the USDOE

Guidance further stated:

> It is urgent to understand the impact of
> COVID-19 on learning. We know, however, that
> some schools and school districts may face
> circumstances in which they are not able to
> safely administer statewide summative
> assessments this spring using their standard
> practices.  Certainly, we do not believe that
> if there are places where students are unable
> to attend school safely in person because of
> the pandemic that they should be brought into
> school buildings for the sole purpose of
> taking a test.

USDOE Guidance, at 2, ECF No. 1-1.  The USDOE Guidance

"emphasize[d] the importance of flexibility in the

administration of statewide assessments."  USDOE Guidance, at 1,

ECF No. 1-1; Compl. ¶ 28.  Suggested testing options included

offering "shortened version" of assessments, extending the

testing window "to the greatest extent practicable," and

"[o]ffering remote administration, where feasible."  USDOE

Guidance, at 1, ECF No. 1-1; Compl. ¶ 28.

The USDOE Guidance also addressed the procedure for a state to obtain a waiver from federally mandated testing requirements.  Id. ¶ 29.  It stated the following with respect to the effect of the waiver:

> A state receiving this waiver would not be required to implement and report the results of its accountability system, including calculating progress toward long-term goals and measurements of interim progress or indicators, or to annually meaningfully - differentiate among its public schools using data from the 2020-2021 school year. This flexibility would explicitly include waiving the requirement that the Academic Achievement indicator be adjusted to account for a participation rate below 95 percent. The state would also not be required to identify schools for comprehensive support and improvement (CSI), targeted support and improvement (TSI), and additional targeted support and improvement (ATSI) based on data from the 2020-2021 school year. Each state that receives the accountability and school identification waivers would be required to continue to support previously identified schools in the 2021-2022 school year, resume school identification in the fall of 2022, and ensure transparency to parents and the public, as described below, including publicly reporting the percentage of students not assessed, disaggregated by student subgroup.

USDOE Guidance, at 1-2, ECF No. 1-1.

Shortly thereafter, on March 3, 2021, the WVDOE sought a waiver (the "USDOE Waiver") from the 95% test participation rate requirement, which it obtained from USDOE on April 6, 2021. Id. ¶ 30.

According to McCoy, the Board did not circulate "any new letters, notices or update information sheets to Belle families or the general public advising that [the Board] was now obligated[4] to offer flexible and safe testing for children, particularly Online Learners." Id. ¶ 36. According to McCoy, the Board "sought to suppress" such information. Id. ¶ 37. However, McCoy does not allege facts that indicate the Board ever received information regarding the federal guidance or the waiver.

As the spring 2021 testing period approached, parents and guardians of Online Learners expressed concerns about in-person testing to Belle Elementary teachers, who then communicated these concerns to McCoy in her capacity as the School Test Coordinator. Id. ¶¶ 41-42. The resumption of the WVGSA also concerned McCoy, who feared testing in-person at Belle Elementary would place students at risk of contracting COVID-19. See Compl. ¶¶ 39-40. McCoy believed the contents of the WVDOE Letter and WVGSA FAQ were not only inaccurate, but also were contrary to federal requirements, her professional code of ethics as school counselor, and "moral principles."

---

[4] Other than this and similar conclusory statements that the Board was "obligated" to offer "flexible and safe testing," McCoy offers no factual basis to establish the existence of such an obligation. See infra. at 47-49.

Compl. ¶ 40; see also id. ¶ 42.  McCoy "consulted the American Counseling Code of Ethics . . ., which is binding on [Licensed Professional Counselors] in West Virginia and has been adopted by the West Virginia Board of Examiners in Counseling to govern its counselors."  Id. ¶ 44.[5]  McCoy "concluded she had an ethical obligation as a counselor, educator, and as a private citizen to inform the public of the potentially life-saving options and information offered by the USDOE," id. ¶ 6, and of "the availability of safe testing options to the children and families that she serves," id. ¶ 45.

McCoy first expressed her concerns to school administrators.  Initially, she requested a meeting with Belle Elementary's principal, Danielle Burke ("Burke"), "to share her concerns that household members of Belle Online Learners could be placed at increased risk of serious illness or death if those children were required to take the WVGSA" in person.  Id. ¶ 48. During a brief meeting, which McCoy estimates lasted "at most" 15 to 20 seconds, McCoy sought permission to communicate to parents and guardians of Belle students the availability of safe

---

[5] The complaint also refers to the National Education Association's Code of Ethics for Educators and the American School Counselor's Association Ethical Standards for School Counselors.  Compl. ¶¶ 46-47.  While the complaint alleges Ms. McCoy is bound by these ethical codes, it does not allege she consulted or otherwise was aware of them.

testing options, including "skipping the test altogether." Id. ¶ 48. Burke "emphatically" disagreed with McCoy's view that in-person testing presented an ethical dilemma and prohibited McCoy from providing "any additional information to parents/guardians of Online Learners" about other testing options. Id. ¶ 49.

McCoy then spoke to Jon Duffy ("Duffy"), director of Counseling and Testing for Kanawha County Schools, because she hoped that he, "as a school counselor, would understand the ethical dilemma and would contact Burke to assist in working out an agreement that everyone could live with." Id. ¶ 50. Duffy also rebuffed McCoy, saying that in-person testing did not create an ethical dilemma and similarly prohibiting McCoy from informing parents or guardians about other testing options "unless they called her directly to ask." See Compl. ¶¶ 50-51. Duffey was concerned that lower participation rates could affect KCS's ability to meet the 95% participation threshold in future years, when the USDOE will again require such participation rates. Id. at ¶ 51.

"Because both Burke and Duffy refused to permit McCoy to disseminate information about safe testing options through Schoology[6] or any other formal school communication platform,"

---

[6] Schoology is a website which serves as KCS's "official school communication platform." Compl. ¶ 5. Online Learners received classroom instruction through Schoology, which enables two-way

McCoy decided to contact news media outlets as "an alternative method to convey this potentially life-saving information" to parents and guardians of Belle students as well as to "other potentially vulnerable persons throughout the public school system in West Virginia."  Id. ¶ 52.  With in-person testing set to commence on Monday April 19, 2021, McCoy, on Saturday April 17, 2021, contacted "news media throughout the state in the hope that they would see the importance of this information and disseminate it to the public in the form of a news story." Compl. ¶ 53.  McCoy represented herself as a "whistle-blower" to the media and did so because parents and guardians had not been informed of their "right" to safe testing alternatives, including opting out of testing.  Id. ¶ 53; see also id. ¶ 48. McCoy also identified herself as a "counselor at Belle Elementary School" who has "talked to many parents who aren't comfortable with sending their kids to school in person for testing."  Compl. Ex. 5, at 2, ECF No. 1-5 (WCHS-TV story published as a result of McCoy's outreach) (hereinafter, the "News Story").  Of the news media outlets she contacted, only WCHS-TV broadcast a story, which ran on April 19, 2021, and

---

audio and video communication between teachers, Online Learners, and their parents and caretakers.  Id. ¶ 5 n.1

featured interviews with McCoy and Duffey.  Id. ¶ 61; see News Story.

On April 18, 2021, after she contacted news media but before the News Story was published, McCoy emailed Superintendent Williams.  Id. ¶ 56.  In her email, McCoy explained her concern for her "students and my families," who, she felt, could get "facts and basic data" only through news coverage.  Id. ¶ 56.  In a reply email, Williams expressed his belief that there had been no ethical dilemma and explained that schools had made "arrangements" for students to test at different times.  Williams also made clear his and the Board's interest in continuing to require in person testing: "The reason the students need to test is so we can see where the gaps are and thus be better able to serve them.  The students need a return to normalcy which includes doing things that are familiar to them," and he concluded by adding, "[t]hinking outside the box would have taken care of this issue."  Id. ¶¶ 59-60; Compl. Ex. 4, ECF No. 1-4 (Williams' response to McCoy's email).  McCoy responded that she had "asked to think outside of the box" by creating testing alternatives but had been prevented by Burke and Duffey from making "accommodations for those that needed them."  Id. ¶¶ 59-60.

Testing was set to begin on April 19, 2021.  <u>See</u>
Compl. ¶ 53 (alleging April 17, 2021, was "two days before
testing was to commence at Belle.").  That day, at the direction
of Belle Elementary Principal Danielle Burke, the WVDOE Letter
and WVGSA FAQ were distributed a second time to parents and
guardians of students of Belle Elementary.  <u>Id.</u> ¶ 38.  Also on
April 19, 2021, Burke posted on Belle Elementary's Schoology
site, "the official online platform [of Kanawha County Schools]
through which classroom instruction was provided to Online
Learners and which enables two-way audio and video communication
between teachers, Online Learners, and their parents and
caretakers," that "STUDENTS WILL NEED TO COME FOR TESTING."  <u>Id.</u>

That same day, WCHS-TV published the News Story.  <u>See</u>
News Story.  It articulated McCoy's concerns "about the testing
being required for all students, even" Online Learners, and
quoted her as saying "They feel like they don't have a choice.
They just have to send their kids in to this public school
environment even though they've been keeping them at home for
safety reasons. . . . The school is going to be more packed than
it's ever been, even though the pandemic is still going on.
They're being told words like it's mandatory, and it's
required."  News Story, at 2.  The News Story also quoted Duffy
as noting the WVGSA "allows us to pinpoint the performance of

each of our students in reading, writing, math and science";
"[t]here will not be penalties for not testing; and that the
school "will be glad to accommodate [concerns about the health
and safety of the child coming into the building to test]." Id.
at 2-3.

On April 27, 2021, McCoy received a formal letter of
reprimand (the "Reprimand Letter") from the Board, signed by
Williams on April 21, 2021, for providing inaccurate information
"in [her] capacity as a counselor for [KCS]" and for
insubordination. Id. ¶ 67. Other allegedly retaliatory actions
and adverse changes to McCoy's employment conditions followed at
Belle Elementary, including increasing the number of counseling
sessions McCoy must conduct; excluding her from a Cultural
Diversity Collaborative Team, resulting in a loss of pay, for
the 2021-22 school year; removing her from her role as School
Testing Coordinator; removing her as Lead Coordinator of a needy
student Christmas program; moving her office to an isolated
location; and Burke, who stopped promptly responding to McCoy's
emails about counselor advisory committee meetings, also began
"repeatedly addressing her in an insulting and accusatory tone,
sometimes doing so loudly in the presence of McCoy's coworkers
and/or colleagues." Id. ¶ 70(a)-(i).

McCoy brings two causes of action: Count I alleges a violation of her right to freedom of speech guaranteed by the First Amendment of the United States Constitution, as incorporated by the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983 (the "§1983 claim"); and Count II alleges a violation of the West Virginia Whistle-blower Law, W. Va. Code § 6c-1-1 et seq (the "whistle-blower claim").

## II.   Applicable Law

The Board and Williams have moved to dismiss McCoy's complaint for lack of subject matter jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6).

### a.   Rule 12(b)(1)

Federal subject-matter jurisdiction exists only to the extent authorized by the United States Constitution and federal statute.  Where subject-matter jurisdiction is lacking, so, too, is the court's authority to adjudicate claims, and the action must be dismissed.

### b.   Rule 12(b)(6)

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a pleading to contain "a short and plain statement of the claim showing . . . entitle[ment] to relief."  Fed. R. Civ.

P. 8(a)(2); Erickson v. Pardus, 551 U.S. 89, 93 (2007).  A party may test the sufficiency of a pleading by moving under Rule 12(b)(6) to dismiss it for "failure to state a claim upon which relief can be granted."  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-58 (2006).

In order to defeat a 12(b)(6) motion, a complaint must contain "enough facts to state a claim that is plausible on its face."  Twombly, 550 U.S. at 570.  The court, at this early stage, "must accept as true all of the factual allegations contained in the complaint."  Erickson, 551 U.S. at 94 (citing Twombly, 550 U.S. at 555-56).  Further, all reasonable inferences are drawn in favor of the plaintiff.  E. I. du Pont de Nemours & Co. v. Kolon Indus., 637 F.3d 435, 440 (4th Cir. 2011) (citing Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250 (4th Cir. 2009)).  "Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation."  Iqbal, 556 U.S. at 678.

III.   Analysis

a.   Subject-matter Jurisdiction

The defendants first argue, in a footnote, that the court lacks subject-matter jurisdiction over both of McCoy's claims inasmuch as public employees are required to administratively exhaust claims pursuant to the West Virginia Public Employees Grievance Procedure ("PEGP") prior to initiating a judicial action.  Def. Mem. of Law at 5-6 n. 1, ECF No. 6.  The defendants rely on the general rule under West Virginia Law, stated in Durelle v. Traders Federal Savings & Loan Ass'n, 104 S.E.2d 320 (W. Va. 1958), that administrative remedies must be exhausted prior to initiation of a civil action.  Syl. Pt. 1, 104 S.E.2d 320; see Def. Mem. at 5 n.1, ECF No. 6.  For public employees like McCoy, this means resorting to the procedures set forth in the PEGP.  Def. Mem. At 5 n.1. Having failed to avail herself of the PEGP, the defendants argue that the court lacks subject-matter jurisdiction to hear either of McCoy's claims inasmuch as they arise out of the same set of facts.

Plaintiff asserts that the PEGP is inapplicable to her Whistle-blower and First Amendment claims.  Pl.'s Resp. at 4-5, ECF No. 9.  As to her state law whistle-blower claim, McCoy relies on Weimer v. Sanders, a decision of the West Virginia

17

Supreme Court of Appeals which held that a public employee is
not required to exhaust pursuant to the PEGP prior to initiating
a complaint in circuit court alleging violations of the West
Virginia Human Rights Act ("WVHRA").  752 S.E.2d 398 (W. Va.
2013).  As McCoy reads that decision, the PEGP cannot determine
liability for either claim because "the option of filing a
grievance is permissible, not mandatory when an independent
statute provides a remedy."  Pl. Resp. at 5, ECF No. 9.  The
defendants counter that Weimer is inapposite to the present case
inasmuch as that case arose under the WVHRA, rather than the
Whistle-blower Law.  Respecting her First Amendment claim, McCoy
directs the court, in a footnote, to the Supremacy Clause of the
United States Constitution.

The PEGP is intended "to provide a procedure for the
resolution of employment grievances raised by the public
employees of the State of West Virginia."  W. Va. Code § 6C-2-1.
To this end, the PEGP affords a three-level grievance procedure
to aggrieved public employees, which progresses from an informal
conference and formal hearing in step one, to alternative
dispute resolution in step two, and finally, in step three, to a
hearing presided over by an administrative law judge.  See W.
Va. Code § 6C-2-4.  The administrative law judge's decision may

be appealed to the Circuit Court of Kanawha County on certain enumerated grounds.  See W. Va. Code § 6C-2-5.

After the present motion became ripe for decision, the West Virginia Supreme Court of Appeals (the "Supreme Court of Appeals") in State ex rel. Devono v. Wilmoth held that the Whistle-blower Law does not require claims brought thereunder to be exhausted pursuant to the PEGP.  889 S.E.2d 736 (W. Va. 2023).  Consequently, the court need not parse out whether and to what extent the holding in Weimer, which dealt with the WVHRA, applies in the context of McCoy's claims.  Although the court has not sought additional briefing (nor have the parties ventured supplemental briefing) on the Devono decision, the court proceeds to analyze its effect on this case.

Devono arose out of a wrongful termination action initiated in the Circuit Court of Randolph County.  Id. at 741. A public school employee sued alleging, inter alia, that she had been wrongfully terminated in violation of the Whistle-blower Law.  Id.  The defendants, the then-superintendent of Randolph County Schools and the Randolph County School Board, moved to dismiss her whistle-blower claim for lack of subject matter jurisdiction, arguing that the plaintiff had not exhausted administrative remedies under the PEGP.  Id. at 742.  After the circuit court denied the defendants' motion, the defendants

19

sought a writ of prohibition in the Supreme Court of Appeals to prevent enforcement of the circuit court's order.  Id.

The Supreme Court of Appeals denied the petition with respect to the claim arising under the Whistle-blower Law, holding that the filing of a grievance pursuant to the PEGP is not required for whistle-blower claims.  Id. at Syl. Pt. 9. Starting with the text of the statute, the Supreme Court of Appeals noted that § 6C-1-4(a) of the Whistle-blower Law expressly provides that "a person who alleges that he or she is a victim of a violation of this article may bring a civil action in a court of competent jurisdiction for appropriate injunctive relief or damages, or both." Id. at 745.  Section 6C-1-4(a), the Devono court found, "clearly and unambiguously" permits the initiation of a civil action in state court for alleged violations of the Whistle-blower Law.  Id. at 746.

The Supreme Court of Appeals next considered § 6C-1-4(e), which provides that "[a]ny employee covered by the civil service system who has suffered a retaliatory action as a result of being a whistle-blower may pursue a grievance under the West Virginia Public Employees Grievance Procedure." Id.  Noting the use of the word "may" in § 6C-1-4(e), the Supreme Court of Appeals found that "the filing of a grievance with respect to an alleged violation of the Whistle-blower Law is permissive and

not mandatory." Id.  Interpreting these two statutory
provisions together, the Supreme Court of Appeals concluded that
"an employee is not precluded by the exhaustion rule from
instituting an action in the circuit court for an alleged
violation of the Whistle-blower Law." Id.  This conclusion, the
Supreme Court of Appeals noted, was consonant with the "clear
public policy" of the State of West Virginia to encourage
"public employees to come forward and report suspected
violations of the law," for which the State Legislature "has
provided a clear remedy – the filing of a civil action." Id.

        Consistent with the holding in Devono, the court finds
that McCoy, as a public employee alleging violations of the
Whistle-blower Law, was not required to administratively exhaust
her whistle-blower claim prior to initiation of a civil action.

        The defendants also argue that this court lacks
subject-matter jurisdiction over McCoy's § 1983 claim because it
arose out of the same facts as McCoy's whistle-blower claim.
Just as McCoy need not exhaust her state law whistle-blower
claim, neither does she need to exhaust her § 1983 claim, which
arises under federal law.  State administrative remedies are
not, except in limited, congressionally prescribed circumstances
inapplicable here, required as prerequisites to bringing an
action pursuant to § 1983.  See Patsy v. Board of Regents of

State of Florida, 457 U.S. 496, 516 (1982).  The court DENIES

the Rule 12(b)(1) motion as to both claims.

### b.    Failure to State a Claim

Defendants next argue that plaintiff fails to state a

claim under either her Second Cause of Action, plaintiff's West

Virginia Whistle-blower Law, W. Va. Code § 6C-1-1, et seq., or

her First Cause of Action, plaintiff's 42 U.S.C. § 1983 claim

for First Amendment retaliation.

### i.  Whistle-blower claim

The defendants contend that McCoy fails to state a

claim inasmuch as her alleged whistleblowing activity is not

covered under the Whistle-blower Law.  Def. Mem. at 6.

The West Virginia Whistle-blower Law provides in

relevant part:

> (a) No employer may discharge, threaten, or
> otherwise discriminate or retaliate against an
> employee   by   changing   the   employee's
> compensation, terms, conditions, location, or
> privileges of employment because the employee,
> acting on his or her own volition, or a person
> acting on behalf of or under the direction of
> the employee, makes a good faith report, or is
> about to report, verbally or in writing, to
> the employer or appropriate authority, an
> instance   of   wrongdoing   or   waste.

W. Va. Code § 6C-1-3.  "Waste" is defined as "an employer or
employee's conduct or omissions which result in substantial
abuse, misuse, destruction or loss of funds or resources
belonging to or derived from federal, state or political
subdivision sources."  W. Va. Code. § 6C-1-2(f).  "Wrongdoing"
is defined as "a violation which is not of a merely technical or
minimal nature of a federal or state statute or regulation, of a
political subdivision ordinance or regulation or of a code of
conduct or ethics designed to protect the interest of the public
or the employer."  § 6C-1-2(h).

        An employee who alleges that an employer violated the
Whistle-blower Law may seek injunctive relief and damages in a
civil action.  Id. § 6C-1-4(a).  In order to prevail on such a
claim, the employee must prove by a preponderance of the
evidence "that, prior to the alleged reprisal, the
employee . . . had reported or was about to report in good
faith, verbally or in writing, an instance of wrongdoing or
waste to the employer or an appropriate authority."  Id. § 6C-1-
4(b).

        The defendants argue that McCoy's whistle-blower claim
is subject to dismissal inasmuch as she is not a "whistle-
blower" under the Whistle-blower Act.  A "whistle-blower" is
statutorily defined as

> [A] person who witnesses or has evidence of
> wrongdoing or waste while employed with a
> public body and who makes a good faith report
> of, or testifies to, the wrongdoing or waste,
> verbally or in writing, to one of the
> employee's superiors, to an agent of the
> employer or to an appropriate authority.

Id. § 6C-1-2(g). The defendants attack the adequacy of the
allegations underpinning McCoy's whistle-blowing claim inasmuch
as McCoy has not alleged that she reported any "wrongdoing" or
"waste" to her "employer" or any other "appropriate authority."
Rather, McCoy alleges she was reprimanded for contacting news
media outlets, an act which the defendants argue is insufficient
to afford her protection under the Whistle-blower Act.

McCoy asserts in her response that "she made a good
faith report of wrongdoing to the Defendants, both of whom
qualify as employers or 'appropriate authority' under [§ 6C-1-
2(a)-(c) of the Whistle-blower Act]." Pl. Resp. at 5. McCoy
also argues that "her disclosure to the local
media . . . qualifies as a protected disclosure to the public."
Id. at 5-6. This is so, McCoy contends, because "government
receives much of its information from public disclosures,
especially media reports of the same." Id. As for the
"wrongdoing" McCoy allegedly reported, it consists of "settled,
national ethical standards for counseling and educators
recogniz[ing] the importance of truth and families' knowledge

and understanding of their legal rights," which the defendants allegedly violated.

The court begins its analysis with the defendants' argument that McCoy did not report to a proper entity. The Whistle-blower Law protects public employees who make a good faith report of wrongdoing to two types of entities: an "employer" or "an appropriate authority." "Employer" means "a person supervising one or more employees, including the employee in question, a superior of that supervisor, or an agent of a public body." W. Va. Code Ann. § 6C-1-2(c). An "appropriate authority" is defined to mean:

> [A] federal, state, county or municipal government body, agency or organization having jurisdiction over criminal law enforcement, regulatory violations, professional conduct or ethics, or waste; or a member, officer, agent, representative or supervisory employee of the body, agency or organization. The term includes, but is not limited to, the office of the attorney general, the office of the state auditor, the commission on special investigations, the Legislature and committees of the Legislature having the power and duty to investigate criminal law enforcement, regulatory violations, professional conduct or ethics, or waste.

Id. § 6C-1-2(a).

McCoy's decision to contact the news media is plainly the centerpiece of her complaint, and so the court first

addresses whether McCoy reported to a proper entity by considering the allegations relevant to the news media.

McCoy has not pleaded or otherwise argued (nor could she plausibly do so) that news media qualifies as an "employer" in the context of this case.  Rather, McCoy advances two arguments in support of her contention that her reporting to the news media was a protected act under the Whistle-blower Law. First, McCoy asserts that reports to the news media are, in effect, reports to one's employer or an appropriate authority inasmuch as "government receives much of its information from public disclosures, especially media reports of the same."[7] Second, McCoy argues in the alternative that even if indirect

---

[7] In support of this argument, McCoy directs the court to a series of out-of-jurisdiction decisions from administrative review boards and the United States District Court for the District of Kansas.  The most glaring issue with these authorities, besides being non-controlling, is that none of them are interpreting West Virginia's Whistle-blower Law.  See Wedderspoon v. City of Cedar Rapids, Case No. 80-WPCA-1, 1980 WL 129159 (DOL Off. Adm. App. July 28, 1980) (claim arising under 33 U.S.C. § 1367); Donovan v. R.D. Andersen Const. Co., 552 F. Supp. 249, 251 (D. Kan. 1982) (arising under 29 U.S.C. § 660(c)); Dobreuenaski v. Associated Universities, Inc., ALJ Case No. 96-ERA-44, 1997 WL 530381 (DOL Adm. Rev. Bd. Aug. 19, 1997) (arising under 42 U.S.C. § 5851); Simon v. Simmons Indust., Inc., Case No. 87-TSC-2, at *4 (DOL Off. Adm. App. Apr. 4, 1994) (arising under four federal environmental whistle-blower provisions); Nunn v. Duke Power Co., Case No. 84-ERA-27, at *13 (DOL Off. Adm. App. Sept. 29, 1989) (arising under 42 U.S.C. § 5851).  Indeed, none of these cases analyze — let alone determine — whether reporting to the media constitutes a report to an "employer" or "appropriate authority" within the same or similar meaning as the West Virginia law.

reporting is not covered by the Whistle-blower Law, her disclosure to the media is nevertheless protected because the media is itself an "appropriate authority."

In response to this latter argument, the defendants note that the express definition of "appropriate authority" nowhere includes or implies news media — the statutory definition includes only government entities or their members. As the court understands McCoy's initial argument, she argues that her disclosure to news media is protected because media are an indirect means of disclosure to one's "employer" or an "appropriate authority" under the Whistle-blower Law.  Such an indirect route to whistleblowing is foreclosed by the text of the Whistle-blower Law, which contemplates a good faith report by the employee "to the employer or an appropriate authority." The Whistle-blower Law, by its plain language, appears not to contemplate a third-party interlocutor who conveys a report of wrongdoing from the employee to the employer or an appropriate authority.  The court is similarly dismissive of McCoy's second argument.  The kinds of organizations contemplated by the term "appropriate authority" are governmental bodies with investigative or oversight powers, not privately-owned businesses such as a news media outlet.  As pleaded, McCoy's report to news media was not made to her "employer" or an

"appropriate authority" as those terms are defined in the Whistle-blower Law.  Consequently, McCoy's decision to contact news media is not an act for which McCoy may avail herself of the protections of the Whistle-blower Law.

Even though her report to the news media is insufficient to state a claim under the Whistle-blower Law, McCoy may still avail herself of the Whistle-blower Law's protections if she did report wrongdoing to her "employer" or "appropriate authority."  McCoy has pleaded that the "Defendants, collectively, constitute an 'employer,'" under the Whistle-blower Law and that McCoy "made a 'good faith report' of 'wrongdoing' by the Defendants, to the Defendants."  Compl. ¶¶ 78-79.

First, McCoy has not alleged that she brought her concerns to the Board, and her only potentially relevant interaction is her April 18, 2021, email to Williams.  McCoy's email explained her decision to contact news media; it did not seek or attempt to report "wrongdoing" or "waste" in its own right.  See Compl. Ex. 3, ECF No. 1-3 (McCoy's April 18 email to Williams in which she stated, "I felt forced to contact the local news media this weekend to get basic facts and information out to the parents at my school. . . . I was very anxious to get this information out"); Compl. ¶ 56.  Indeed, in that email, the

28

only reason she provided for sending it to Williams was that she
"just wanted to let you know [her] side of the story, as to why"
she spoke to the news media.  Compl. Ex. 3, ECF No. 1-3.
Plaintiff only sought to inform Williams of the sequence of
events that preceded her speech to the news media, and the
email's text does not indicate plaintiff reported "wrongdoing"
or "waste."  Id.  Plaintiff justified her speech by telling
Williams, "my counselor code of ethics demand[s] that I provide
all the information to those that I serve," but she does not go
so far as to report a violation of a code, regulation, or law
(i.e., "wrongdoing") by Burke or Duffy.  Accordingly,
plaintiff's April 18, 2021, email to Williams is insufficient to
serve as the basis for a claim under the Whistle-blower Law
against the Board or Williams.

        Second, McCoy may still avail herself of the Whistle-
blower Law if she reports "wrongdoing" or "waste" to an
appropriate agent of the defendants.  As employees of Kanawha
County Schools, Burke and Duffey fit comfortably within the
definition of an "employer" under the Whistle-blower Law.  See
W. Va. Code § 6C-1-2(c) (defining "employer" to mean "person[s]

supervising one or more employees, including the employee in question.").[8]

As the defendants' point out, McCoy's recasting of the allegations – shifting the focus of the whistle-blower claim from McCoy's reporting to news media to her meetings with Burke and Duffey – creates an issue for McCoy, namely, that under the Whistle-blower Law she must allege that the alleged acts of reprisal arose out of a good faith report of an instance of wrongdoing to her employer.  This is problematic for McCoy inasmuch as she does not plead any nexus between her meetings with Burke and Duffey and the acts of retaliation she alleges have occurred.  She pleads only that the Reprimand Letter is "a reprisal against her for exercise of her right to freedom of speech as a private citizen."  Compl. ¶ 69.  Setting aside the legal conclusion that she spoke as a private citizen, the only speech plaintiff pleads was done as a "private citizen" – and, thus, the only speech plaintiff pleads caused the retaliation – was her outreach to the news media.  See, e.g., Compl. ¶ 7 ("[S]he contacted statewide news media . . . in an effort to

---

[8] McCoy, in her response, also posits that the defendants are an "appropriate authority" under the Whistle-blower Law. She has not pleaded as much in her complaint, and so the court need not address this issue.  See Compl. ¶ 78 ("The Defendants, collectively, constitute an "employer" as defined by the Whistle-blower Law.").

inform [affected people]. . . . In taking these actions, McCoy availed herself of the protections under the Whistle-blower Law and her right to freedom of speech as a private citizen.").

The first alleged act of retaliation occurred when McCoy received the Reprimand Letter, which was dated two days after the WCHS-TV report, and four days after she contacted the news media.  The stated reason for McCoy's reprimand in the Reprimand Letter is McCoy's decision to contact news media and, according to Williams, misrepresentations that McCoy made in the WCHS-TV story as well as insubordination.  The content of the Reprimand Letter and the timing of the reprimand support an inference that it was McCoy's decision to contact the news media rather than her meetings with Burke and Duffey that was the basis for the Reprimand Letter.  Indeed, McCoy herself takes the Reprimand Letter at face value.  See Compl. ¶ 69.  That is, as she understands it, the Reprimand Letter is direct retaliation for her contacting the media and not cover for some other act of retaliation by the defendants.  Id.

McCoy does not state when she met with Burke or Duffey, but these meetings presumably occurred sometime between the WVDOE letter in February 2021 and April 17, 2021, when McCoy contacted news media.  In McCoy's own telling, it does not appear that she intended to report wrongdoing to Burke or

Duffey. Rather, as she wrote to Williams on April 18, 2021, McCoy contacted Burke to "ask[] permission" to contact parents, and contacted Duffey "to get support and guidance," neither of which sounds like an attempt to report wrongdoing. Compl. ¶¶ 49-50. Despite McCoy's attempts to recast her alleged whistle-blowing activities to encompass not only her contacting of the news media but also her meetings with Burke and Duffey, McCoy's argument is not supported by a fair reading of her complaint. It further appears that McCoy has not established that "wrongdoing" occurred, inasmuch as the waiver or USDOE Guidance did not, in fact, impose any claimed obligation on the Board or Belle to offer certain testing alternatives. See infra at 47-49.

As for the other alleged acts of retaliation, which variously amount to adverse changes in the conditions of McCoy's employment, McCoy does not state when these acts began, and her complaint similarly does not support an inference that they were connected to her conversations with Burke and Duffy, rather than her outreach to news media.

Accordingly, because McCoy has failed to plead that she is a "whistle-blower" under the Whistle-blower Law, she has failed to state a claim thereunder, and the court will dismiss her Second Cause of Action.

32

ii.   Section 1983 claim

1.   Plaintiff's Claim Against Williams and the Board

Plaintiff brings her First Amendment retaliation claims against both the Board and Superintendent Williams in his official capacity.  Defendants argue that plaintiff's § 1983 claim against Williams is duplicative of that against the Board because she has sued him only in his official capacity.  Def. Mem. 15-16.  Plaintiff admits the same.  Pl. Resp. 9 n.4.

"Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent."  Kentucky v. Graham, 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (internal quotations omitted).  "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity" and should be dismissed on the basis that it is duplicative.  Id. at 166 (citing Brandon v. Holt, 469 U.S. 464, 471–72, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985)).

Here, plaintiff named as defendants both the Board and Williams, acting in his official capacity as Superintendent. The Board received notice and had an opportunity to respond. Inasmuch as plaintiff's claims against Williams in his official

33

capacity is duplicative of those against the Board, the court dismisses plaintiff's retaliation claim against Williams.

   iii. Plaintiff's Claim Against the Board

  McCoy asserts a claim against the Board for First Amendment retaliation in violation of 42 U.S.C. § 1983. Specifically, she alleges that the defendants violated her First Amendment right to free speech by retaliating against her after she spoke to WCHS-TV about the alleged discrepancies between the information that had been provided locally to parents and that which was directed by federal guidance.  In their Motion to Dismiss, defendants argue that plaintiff has failed to state a First Amendment retaliation claim under § 1983 because she has failed to allege that her speech is protected, because she has failed to allege that her interests in the speech outweigh the Board's interests, and because she has failed to allege the existence of a policy or custom that led to any alleged constitutional injury.[9]  Def. Mem. at 8-15.

  The First Amendment protects not only the freedom of speech, but also the "right to be free from retaliation by a

---

[9] As will be discussed below, to state a First Amendment retaliation claim under § 1983 against a local government or a local governmental subdivision, a plaintiff need not plead an official policy or custom that gave rise to the constitutional injury.

public official for the exercise of that right." <u>Suarez Corp.</u>
<u>Indus. v. McGraw</u>, 202 F.3d 676, 685 (4th Cir. 2000).  While
public employees "do not lose their constitutional rights at
work," "the government may impose certain restraints on its
employees' speech and take action against them that would be
unconstitutional if applied to the general public." <u>Adams v.</u>
<u>Trustees of the Univ. of N.C.-Wilmington</u>, 640 F.3d 550, 560 (4th
Cir.2011) (citing <u>City of San Diego v. Roe</u>, 543 U.S. 77, 80
(2004); <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563, 568 (1968)
("[T]he State has interests as an employer in regulating the
speech of its employees that differ significantly from those it
possesses in connection with regulation of the speech of the
citizenry in general."); <u>Urofsky v. Gilmore</u>, 216 F.3d 401, 406
(4th Cir. 2000) ("[T]he state, as an employer, undoubtedly
possesses greater authority to restrict the speech of its
employees than it has as sovereign to restrict the speech of the
citizenry as a whole.")).

        Public employees certainly have a right to speak as
private citizens.  <u>See</u>, <u>e.g.</u>, <u>Pickering</u>, 391 U.S. at 568.  The
Supreme Court, however, has placed great focus on the competing
interests implicated when a public employee speaks: the
interests of the public employee "as a citizen, in commenting on
matters of public concern," and the interests of the government

"as an employer, in promoting the efficiency of the public services it performs through its employees." Connick v. Myers, 461 U.S. 138, at 142 (1983) (quoting Pickering, 391 U.S. at 568); see also Smith v. Gilchrest, 749 F.3d 302, 308 (4th Cir. 2014) (discussing the Supreme Court's analysis of "how the rights of public employees to speak as private citizens must be balanced against the interest of the government in ensuring its effective and efficient operation").

The Fourth Circuit has held in McVey v. Stacy that to state a cognizable First Amendment retaliation claim under § 1983, a public employee plaintiff's complaint must establish "(1) that the employee 'was speaking as a citizen upon a matter of public concern' rather than 'as an employee about a matter of personal interest'; (2) that his 'interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public'; and (3) that his 'speech was a substantial factor' in the employer's decision to take action against him." Gilchrist, 749 F.3d at 308 (quoting McVey v. Stacy, 157 F.3d 271, 277-78 (4th Cir. 1998)).

1. Characterization of Speech

The court first must determine whether plaintiff has sufficiently pled that she was "speaking as a citizen upon a

matter of public concern." McVey, 157 F.3d at 277.  If she
spoke as a public employee, rather than as a citizen, or on a
matter of personal interest, rather than one of public concern,
she has failed to state a claim under § 1983.  Id.  This "can be
further 'divided into two inquiries: whether the speech was made
as a citizen or pursuant to the employee's duties, and whether
the content of the speech addressed a matter of interest to the
community rather than complaints over internal office affairs.'"
Porter v. Bd. of Trustees of N. Carolina State Univ., 72 F.4th
573 (4th Cir. 2023), cert. denied, 144 S. Ct. 693 (2024)
(quoting Crouse v. Town of Moncks Corner, 848 F.3d 576 (4th Cir.
2017) (internal quotations and citations omitted)).

     To determine whether a public employee's speech was
made pursuant to their duties, the court must "engage in a
'practical' inquiry into the employee's 'daily professional
activities.'"  Hunter v. Town of Mocksville, 789 F.3d 389, 397
(4th Cir. 2015) (quoting Garcetti, 547 U.S. at 422, 424).
"Whether the employee spoke at his workplace or away from it is
not dispositive. . . . Likewise, courts must look beyond formal
job descriptions, and 'the listing of a given task in an
employee's written job description is neither necessary nor
sufficient to demonstrate that conducting the task is within the
scope of the employee's professional duties.'"  Crouse, 848 F.3d

at 584 (quoting Garcetti, 547 U.S. at 420, 424-25).  Courts may also look to whether the public employee herself perceived she was engaging in speech pursuant to her duties.  See Porter, 72 F.4th, at 583 (finding "Appellant [spoke] as an employee" in part because his reasoning for the speech "amount[ed] to a description of Appellant's perspective as to his duties as an employee.").

It is also dispositive whether plaintiff's speech addressed a matter of public concern rather than a matter of personal interest.  This inquiry requires "subtle judgment" of the court, Berger v. Battaglia, 779 F.2d 992, 999 (4th Cir.1985), in the determination of "whether the 'public' or the 'community' is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a 'private' matter between employer and employee."  Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337 (4th Cir. 2000) (quoting Berger, 779 F.2d at 999)) (hereinafter, "Chestnut Ridge").  The court must "use the content, form, and context as guideposts in the exercise of common sense, asking throughout: would a member of the community be truly concerned with the employee's speech?"  Id.  "Speech involves a matter of public concern when it involves an issue of

social, political, or other interest to a community." <u>Urofsky</u> <u>v. Gilmore</u>, 216 F.3d 401, 406-07 (4th Cir. 2000) (en banc).

It is clear that plaintiff's speech was a matter of public concern.  The Board does not directly argue that plaintiff's speech was not related to a matter of public concern; rather, it only argues that plaintiff's speech "contradicts and misrepresents the [WVGSA] requirements" and is thus not protected.  Mot. to Dismiss, at 10, ECF No. 5. Interpreting this as an argument that the speech was not on a matter of public concern, the court is unpersuaded.

Plaintiff spoke to WCHS-TV with regard to the WVGSA testing about her concerns that parents of Online Learners had not been comprehensively informed of their options, "the potentially life-saving options" to obtain testing accommodations pursuant to pandemic-related safety concerns. Compl. at ¶ 6.  She spoke in an attempt to provide "parents and guardians all over West Virginia" "all of the facts available . . . so they could make the most informed decision for their family's safety with regard to in-person testing at their schools."  <u>Id.</u> at ¶ 40.  Further, according to plaintiff, numerous parents – members of the public – had previously "express[ed] concerns about the requirement that their children take the tests in-person at Belle."  <u>Id</u>. at ¶ 40.

Plaintiff's speech, at bottom, contained two general substantive categories of communication: public safety and a disagreement with the Board's WVGSA preparation regarding Online Learners.  Public safety is a "quintessential matter of 'public concern.'"  Chestnut Ridge, 218 F.3d at 353.  Additionally, "employee criticisms of employer policy made privately to the public employer may nevertheless be on a matter of public concern where the content and the context reveal that the expression is not merely that of a private grievance."  Berger, 779 F.2d at 999.  Plaintiff here spoke to the news media, in the context of a still-ongoing pandemic, on a topic over which, plaintiff claims, members of the community had already expressed genuine concern.  See Compl. ¶ 41 (alleging parents expressed concerns to Belle teachers regarding in-person testing); News Story ("[McCoy] said she's talked to many parents who aren't comfortable with sending their kids to school in person for testing.").  Though plaintiff's speech resulted from a disagreement with her employer's policy regarding the extent that the Board would inform parents of alternate testing options, it was not merely a personal grievance.  Accordingly, plaintiff's speech was on a matter of public concern.

The court must also determine whether plaintiff spoke as a private citizen or pursuant to her duty as a public

employee by "engag[ing] in a 'practical' inquiry into [plaintiff's] 'daily professional activities.'" [10]  Hunter, 789 F.3d at 397 (quoting Garcetti, 547 U.S. at 422, 424).  According to her complaint, plaintiff was a "long-time School Counselor for Belle Elementary School," and, "for the nine years prior to the" events giving rise to this action and in the spring of 2021, plaintiff "was the School Test Coordinator, tasked with administering the WVSGA under the supervision of Burke and Duffy."  Compl. ¶ 1, 23.  In her capacity as School Counselor and as School Test Coordinator, in the days leading up to the testing, "teachers of Online Learners advised McCoy" that parents were "expressing concerns" about in-person testing requirements.  Id. at ¶ 41, 42.

Plaintiff "consulted the American Counseling Association Code of Ethics ("ACA Code"), which is binding on Licensed Professional Counsellors in West Virginia and has been adopted by the West Virginia Board of Examiners in Counseling to govern its counselors." [11]  Compl. ¶ 45-46.  As a counselor, she

---

[10] Inasmuch as this inquiry is a question of law, see Urofsky, 216 F.3d at 406, the court discounts plaintiff's conclusory statements in her complaint that she spoke merely "as a private citizen," Compl. ¶ 6, 7, 11, 64, 65, 66, 69, 73.  See Iqbal, 556 U.S. at 678 ("[The court] is not bound to accept as true a legal conclusion couched as a factual allegation.")

[11] Plaintiff also avers that her conduct in this matter was "governed by" two other ethical codes of educators and school

sought Burke and Duffy's permission to affirmatively inform students that "safer options were available" as an alternative to in-person testing, which both refused.  Id. at ¶ 48-50. Plaintiff still sought to convey "information about safe testing options," and thus "devised an alternative method" to using "Schoology or any formal school communication platform."  Id. at ¶ 52.  Thus, on the weekend prior to the WVGSA, plaintiff contacted "statewide news media outlets to inform them of her concerns."  Id. at 53.  While doing so, plaintiff "expressly characterized herself as a whistle-blower," id. at 54, but also identified herself as "a counselor at Belle Elementary School." News Story, ECF No. 1-5.

        These allegations, the court finds, are insufficient to establish that plaintiff spoke as a private citizen, rather than pursuant to her duties as a public employee.  Her allegations make clear that, as part of her ongoing duties and responsibility as a School Test Coordinator and School Counselor, she was a key source of information and point person for questions regarding WVGSA procedures for both parents and other Belle Elementary teachers.  See Compl. ¶ 41; News Story ("[Plaintiff] said she's talked to many parents who aren't

_____

counselors, but she does not plead that she consulted or otherwise knew about them.  Compl. ¶ 44-47; see infra 9 n.5.

comfortable with sending their kids to school in person for
testing.").  Further, plaintiff spoke by identifying herself as
a public employee, identifying herself as a counselor at Belle
Elementary and bolstering her credibility by discussing
conversations she has had in that capacity.

Certainly, it is true, as plaintiff argues in her
response brief, that her "official duties did not include
expressing her dissent or concerns about the [d]efendants'
alleged refusal to inform students and their parents of"
alternative testing options, that plaintiff spoke to the news
media on her own time, and that defendants did not "retain
[plaintiff] as a media relations agent."  Pl. Resp. Br. 7, ECF
No. 9; see Compl. ¶ 1, 23 (describing plaintiff as a School
Counselor and School Test Coordinator); ¶ 53.  However, that an
employee spoke away from her workplace is not dispositive, and a
court must look beyond "formal job descriptions" in determining
whether an employee spoke as an employee or a private citizen.
Crouse, 848 F.3d at 584; see also Hunter, 789 F.3d at 397.

Despite plaintiff's arguments, her speech fell within
the realm of what she and others understood to be her duties as
a public employee: to communicate information regarding the
WVGSA procedures at Belle Elementary School.  Having been
prohibited by Burke and Duffy from sharing with parents

information about the district's waiver, plaintiff spoke to the news media as an "alternative" to "Schoology or any other formal school communication platform."  Compl. ¶ 52.  In arriving at her decision to speak to the news media, she "consulted the [ACA Code], which is binding on LPCs in West Virginia" and governs counselors in the state.  Id. at ¶ 44-45.  Further still, the complaint itself describes that plaintiff "concluded she had an ethical obligation as a counselor, educator, and as a private citizen" to engage in the speech in question.  Id. at ¶ 6.  Thus, she understood her speech to be derivative of and directly related to her duties as the School Counselor and School Test Coordinator.  See Porter, 72 F.4th, at 583 (finding "Appellant [spoke] as an employee" in part because his reasoning for the speech "amount[ed] to a description of Appellant's perspective as to his duties as an employee.").

The court finds that though plaintiff has sufficiently pled that she spoke on a matter of public concern, she has failed to plead facts sufficient to establish that she spoke as a private citizen, rather than as a public employee.  She has thus failed to state a First Amendment retaliation claim under § 1983.

## 2. Balancing of Interests

Even assuming _arguendo_ that plaintiff spoke as a private citizen on a matter of public concern, the court finds that the defendant Board's interests in providing efficient and effective services outweighs plaintiff's interest to speak on this matter.  _Pickering_ and the second prong of the _McVey_ test "requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public."  _Brickey v. Hall_, 828 F.3d 298, 304 (4th Cir. 2016) (quoting _Connick_, 461 U.S. at 150).  This governmental interest must be balanced against "the interests of the [employee], as a citizen, in commenting upon matters of public concern."  _Id._ (quoting _Pickering_, 391 U.S. at 568).  In addition, "[t]he public's interest in hearing the employee's speech also weighs in the balance: 'A stronger showing of public interest in the speech requires a concomitantly stronger showing of government-employer interest to overcome it.'"  _Id._ (quoting _McVey_, 157 F.3d at 279 (Murnaghan, J., concurring)).

In analyzing this balance, the court "'must take into account the context of the employee's speech' and 'the extent to which it disrupts the operation and mission' of the

institution."[12] <u>Ridpath v. Bd. of Governors Marshall Univ.</u>, 447
F.3d 292, 317 (4th Cir. 2006) (quoting <u>McVey</u>, 157 F.3d at 277).
It is well established that "factors relevant to this inquiry
include whether a public employee's speech (1) impaired the
maintenance of discipline by supervisors; (2) impaired harmony
among coworkers; (3) damaged close personal relationships; (4)
impeded the performance of the public employee's duties; (5)
interfered with the operation of the institution; (6) undermined
the mission of the institution; (7) was communicated to the
public or to coworkers in private; (8) conflicted with the
responsibilities of the employee within the institution; and (9)
abused the authority and public accountability that the
employee's role entailed." <u>Brickey</u>, 828 F.3d at 304 (finding

---

[12] Plaintiffs argue that the second <u>McVey</u> factor is not to be
assessed at the motion to dismiss stage and should be assumed
satisfied until a factual record has been developed.  Pl. Resp.
Br. 8 ("The law does not require McCoy to plead that her speech
failed to disrupt the workplace, and furthermore, nothing in the
Complaint suggests her speech impeded her or other employees'
duties.") (citing <u>Ridpath</u>, 447 F.3d at 317-18).  Plaintiff,
however, cherry picks and misinterprets <u>Ridpath</u>.  There, the
court did indeed decide that the plaintiff had sufficiently pled
satisfaction of this second prong, finding that "[a]t the Rule
12(b)(6) stage, Ridpath's allegations warrant the inference that
his free speech interests outweigh the detrimental effect, if
any, his comments may have had on the efficiency of the
workplace." <u>Ridpath</u>, 447 F.3d at 318.  The court found that
"[a]ccepting [his] allegations as true and giving Ridpath the
benefit of the reasonable factual inferences . . . he has
satisfied the second prong of the McVey test." <u>Id.</u>  That
analysis is plainly an application of the second <u>McVey</u> prong at
the motion to dismiss stage.

the above balancing test and factors clearly established for purposes of qualified immunity analysis) (quoting Ridpath, 447 F.3d at 317).  "The employer need not prove actual disruption, but only that an adverse effect was reasonably to be apprehended." Id. (quoting Maciariello v. Sumner, 973 F.2d 295, 300 (4th Cir. 1992)) (internal quotations omitted).

Applying this standard in Ridpath, the Fourth Circuit made clear that a complaint satisfies this balancing inquiry unless "'it appears beyond all doubt that [plaintiff] can prove no set of facts' to tip the [second prong of McVey] balance in [her] favor." 447 F.3d at 318 (quoting Trulock v. Freeh, 275 F.3d 391, 405 (4th Cir.2001)).  There, the Fourth Circuit analyzed a retaliation claim of a public employee whose complaint did "not specify" the precise content of his remarks. Id. at 317.  Finding that neither the plaintiff's amended complaint nor defendant's briefing indicated how his comments "impaired the maintenance of discipline, hurt workplace morale, [] constituted an abuse of [plaintiff's] position[, or] . . . how . . . [plaintiff's] remarks interfered with the University's efficient operation," the court found that the "complaint alleges that [plaintiff] was relieved of his adjunct teaching position for protected statements that had no impact on his workplace whatsoever."  Id.

The same cannot be said in this matter: Much of the
complaint alleges facts that show plaintiff's speech was
misleading, undermined the mission of the Board, and conflicted
with her responsibilities as a Belle employee.  Though plaintiff
certainly has a strong interest in speaking about matters of
public concern like public health, she has far more limited (if
any) interest in conveying misleading information regarding the
WVGSA and the Board's testing requirements.  Plaintiff's
complaint alleges that, after receiving the Waiver, the Board
"was now obligated to offer flexible and safe testing options
for children . . . who may reside with fragile household
members."  Compl. ¶ 34.  However, the USDOE Guidance appended to
the complaint belies that statement.  Therein, the USDOE makes
clear that the effect of the waiver is to waive "the
accountability and school identification requirements in the
Elementary and Secondary Education Act of 1965,"[13] and it
explains which requirements are waived and which remain in
force.  USDOE Guidance, ECF No. 1-1, at 1-2.  Indeed, the USDOE
Guidance makes clear that the waiver does not impose on schools
any obligation or requirement to change their testing procedure;
rather it "encouraged states and school districts to consider
other steps" to reduce the stakes of the assessment and told

---

[13] 20 U.S.C. § 70, et seq.

states that schools "should use that flexibility [in the administration of statewide assessments] to consider" changes to testing procedures if they "face circumstances in which they are not able to safely administer" the testing "using their standard practices." Id. at 2.  Such encouragement does not impose a requirement, and the plaintiff has failed to otherwise plead that the waiver itself included any such requirement to change testing procedures.

According to the complaint, communication from the WVDOE reflected a continued state-level requirement that all students complete the WVGSA and permitted counties to institute their own testing procedures or requirements.  See Compl. Ex. 2, WVDOE Letter, ECF No. 1-2 ("Yes, virtual school students are considered public school students and are required to take the annual statewide summative tests at the grade level they are enrolled. . . . The test will be administered . . . as determined by the county.").  Further, though the complaint alleges that "Duffy conceded that children were not required to take the test," Compl. ¶ 9, the complaint, itself, again shows this is untrue: in the News Story, appended to the complaint, Duffy only clarifies that "[t]here will not be penalties for not testing."  News Story, ECF No. 1-5.

The complaint implies that the public has an interest in knowing that West Virginia has received a waiver from federal accountability standards from the 2020-21 school year.  Compl. ¶ 4-7, 40 (variously referring to such information as "potentially life-saving" and "important health and safety information" that parents had a right to know).  Parents, however, also have a strong interest in obtaining "information on how their children are doing."  USDOE Guidance, ECF No. 1-1.

The Board has a particularly strong interest in providing and tracking its students' education by conveying to students that WVGSA remained mandatory and requiring them to test in person to ensure high participation rates.  Plaintiff acknowledges that defendant has a purported interest in avoiding "lower test participation rates not just that year, but also in future years when accountability standards are reinstated." Compl. ¶ 5; see id. at ¶ 51.  Through the complaint's attachments, however, plaintiff also makes clear that the Board has a strong interest in having all of their students complete the WVGSA.  The USDOE Guidance expresses various interests that schools and states have in the data sourced from such comprehensive testing.  See USDOE Guidance, ECF No. 1-1.  For example, it states that "[t]o be successful once schools have re-opened, we need to understand the impact COVID-19 has had on

learning and identify what resources and supports students need.
We must also specifically be prepared to address the educational
inequities that have been exacerbated by the pandemic, including
by using student learning data . . . State assessment and
accountability systems play an important role in advancing
education equity." Id. at 1.  Additionally, the section titled,
"Assessments," begins with a clear statement of interest in
obtaining data sourced from testing: "It is urgent to understand
the impact of COVID-19 on learning." Id. at 2.

        The WVDOE Letter additionally manifests a significant
interest in requiring students to complete the WVGSA.  WDVOE
Letter, ECF No. 1-2, at 1 ("Although counties and schools
continue to deal with challenges, it is even more critical this
year that we obtain data on each of our students to further
measure how much impact the pandemic has had on student
learning. The WVGSA results will help to identify any
achievement gaps that may have occurred so teachers can
determine how best to bridge those gaps.").  Finally, the Board
expressed a similar interest in ensuring high participation
rates in testing, noting that the Board "need[s] kids to test in
order to better help their achievement during this difficult
academic time." Reprimand Letter, ECF No. 1-2, at 3.  As Burke
and Duffy made clear, that interest includes the interest to

maintain in-person testing to bolster population for the coming WVGSA and future years.

Turning to the nonexclusive <u>Ridpath</u>/<u>Brickey</u> factors articulated above, <u>see</u> <u>infra</u> at 45-46, the court finds that, on balance, they weigh in favor of finding that the Board's interest outweighed plaintiff's interest in her right to speak on this matter.  Not surprisingly, the complaint is silent as to whether plaintiff's speech impaired the maintenance of discipline, impaired harmony among coworkers, or damaged close personal relationships.  <u>See</u> <u>Brickey</u>, 828 F.3d at 304 (the first, second, and third factors).  Inasmuch as plaintiff "was the School Test Coordinator, tasked with administering the WVSGA under the supervision of Burke and Duffy," her speech impeded the performance of her duties because she acted in direct contradiction of their instruction.  <u>Id.</u> (fourth and eighth factors); Compl. ¶ 51, 52.  Belle Elementary and the Board's mission was to ensure high participation rates to better track overall student performance, and by pleading that she provided misleading and different information to parents days before the WVGSA began, plaintiff interfered with the operation of the Board and undermined its mission and the procedures that her supervisors and employer thought best.  <u>Brickey</u>, 828 F.3d at 304 (fifth and sixth factors); Compl. ¶ 51; Reprimand Letter Ex. 2,

at 3-4.  Plaintiff spoke publicly, rather than privately among coworkers, increasing the likelihood that her speech would disrupt Belle's operations.  Brickey, 828 F.3d at 304 (seventh factor); see Durstein v. Alexander, 629 F. Supp. 3d 408, 425 (S.D.W. Va. 2022) (finding speech made in public, rather than in private, tilts the factored balancing test in favor of employer).  And though it seems that plaintiff did not intend to abuse her authority or the public trust, she spread misleading information that contradicted the Board's policies, and the ninth factor leans somewhat in favor of the Board.  See Brickey, 828 F.3d at 304 (ninth factor).

While it is true, as in Ridpath, that the complaint does not plead specific disruptions, the court finds that, in light of the Board's exceedingly strong interests in ensuring high participation to track student progress mid- and post-pandemic and plaintiff's far weaker interest in providing the press information that differs from her employer's instruction and that misstates the effect of the waiver, under the substantial weight of the Ridpath factors falling in favor of the Board, "it appears beyond all doubt that [plaintiff] can prove no set of facts to tip the [second prong of the McVey] balance in [her] favor."  Ridpath, 447 F.3d at 318 (internal quotations omitted).

### 3. Substantial Factor

Under the third <u>McVey</u> prong, the complaint must allege
that plaintiff's "speech was a substantial factor" in the
Board's decision to retaliate against her.  <u>McVey</u>, 157 F.3d at
278; <u>see</u> <u>Gilchrist</u>, 749 F.3 at 308.  In their motion to dismiss,
defendants do not claim that plaintiff's complaint fails to
plead that her speech to the news media was a "substantial
factor" of the alleged retaliatory actions.  Accordingly, the
court considers this element met for the purposes of this
motion.

### 4. Conclusion as to Plaintiff's § 1983 Claim

The court has found that plaintiff's complaint fails
to plead sufficient facts to state a First Amendment retaliation
claim under § 1983 because she has failed to plead that she
spoke as a private citizen rather than a public employee and
because her complaint and its attachments demonstrate beyond
doubt that the Board's interest in effective and efficient
fulfillment of its responsibilities to the public outweigh
plaintiff's right to speak as she did on this matter.
Accordingly, plaintiff's First Cause of Action must be
dismissed.

IV. Conclusion

For the foregoing reasons, the court finds that plaintiff has failed to state either a First Amendment retaliation claim under § 1983 or a claim under the West Virginia Whistle-blower Law, Va. Code § 6C-1-2, et seq., against any defendant.  Accordingly, the court GRANTS defendants' Motion to Dismiss in full.

The Clerk is directed to transmit copies of this order to all counsel of record and to any unrepresented parties.

ENTER: April 25, 2024

John T. Copenhaver, Jr.
Senior United States District Judge